IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 21-cr-43-CFC |
| FELIX JUAN ARROYO-MARRERO, | |
| Defendant. | |

## MEMORANDUM

Pending before me is Defendant Felix Juan Arroyo-Marrero's Motion to Reduce Sentence under 18 U.S.C. § 3582(c)(1)(A). D.I. 164. Arroyo-Marrero filed this motion *pro se*. *See* D.I. 164. Section 3582(c)(1)(A) authorizes a court to reduce a sentence if, after considering the factors in 18 U.S.C. § 3553(a), "extraordinary and compelling reasons warrant such a reduction," and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Arroyo-Marrero argues that I should reduce his sentence because his wife has stage IV cancer and his father has Alzheimer's. D.I. 164-4 at 1. The government opposes Arroyo-Marrero's motion. D.I. 169.

### I. BACKGROUND

Arroyo-Marrero pleaded guilty in August 2022 to one count of conspiracy to distribute 500 grams or more of cocaine, a Schedule II controlled substance, in

violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. D.I. 89 ¶ 1. Between October 2020 and April 2021, Arroyo-Marrero was a leader in a conspiracy to distribute cocaine in Delaware. D.I. 157 ¶¶ 15, 62. A wiretap revealed that between October 2020 and December 2020, Arroyo-Marrero frequently supplied a Wilmington-based dealer with cocaine—often up to one kilogram per day. D.I. 157 ¶ 17. After this dealer was arrested in late December 2020 for attempting to transport multiple kilograms of cocaine from Mexico to Delaware, D.I. 157 ¶¶ 20, 24, the dealer's wife began buying cocaine from Arroyo-Marrero for several months, D.I. 157 ¶ 27. In January 2021, Arroyo-Marrero coordinated with his supplier to ship two kilograms of cocaine from Puerto Rico to Delaware. D.I. 157 ¶ 29. Arroyo-Marrero not only selected the "perfect" address to which the cocaine would be delivered, D.I. 157 ¶ 33, but also recruited his cousin to accept delivery of the package, D.I. 157 ¶¶ 29–32. The DEA ultimately intercepted this package, which contained two kilograms of cocaine. D.I. 157 ¶¶ 35–36.

Between March 2021 and April 2021, Arroyo-Marrero continued brokering cocaine deals by selling to other dealers and purchasing kilograms of cocaine from his suppliers. D.I. 157 ¶ 38. Arroyo-Marrero regularly brokered multi-ounce, and even multi-kilogram, cocaine deals. D.I. 157 ¶ 38. On March 12, 2021, Arroyo-Marrero bought five kilograms of cocaine from two different suppliers. D.I. 157 ¶¶ 38–39.

On April 9, 2021, law enforcement learned that Arroyo-Marrero was organizing what was believed to be a retaliatory shooting. D.I. 157 ¶ 41. Later that day, Philadelphia police officers arrested Arroyo-Marrero and two other persons in a car. D.I. 157 ¶ 42. Officers found in the car a bag that contained a ski mask, clothing, and two handguns. D.I. 157 ¶ 43. One of the handgun's serial number had been removed; the other handgun was of unknown manufacture and had no serial number. D.I. 157 ¶ 43.

While DEA agents waited for a search warrant of Arroyo-Marrero's residence—where Arroyo-Marrero lived with his wife, four children, and father (D.I. 157 ¶ 94)—they saw an individual leave the home with a large bag. D.I. 157 ¶ 44. The individual placed the bag in a Porsche registered to Arroyo-Marrero. D.I. 157 ¶ 44. Arroyo-Marrero's cousin then arrived in a pickup truck to collect both the bag from the Porsche and a bag inside the house. D.I. 157 ¶ 44. Law enforcement subsequently searched the pickup truck and found that the bags contained a handgun and an assault rifle. D.I. 157 ¶ 45. Law enforcement later learned that, in addition to these two firearms, two kilograms of cocaine had also been removed from the house before the search. D.I. 157 ¶ 46. In the days after Arroyo-Marrero's arrest, Arroyo-Marrero's supplier and wife discussed his arrest. D.I. 157 ¶ 47. During these conversations, Arroyo-Marrero's wife admitted that she had disposed of evidence after Arroyo-Marrero's arrest. D.I. 157 ¶ 47. Based

3

on its investigation, the government determined that Arroyo-Marrero was responsible for distributing between five and fifteen kilograms of cocaine. D.I. 157 ¶ 48.

On June 10, 2021, Arroyo-Marrero was charged with conspiracy to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. D.I. 157 ¶ 5. On August 3, 2022, Arroyo-Marrero pleaded guilty to this offense. D.I. 157 ¶ 6; D.I. 89.

Arroyo-Marrero's presumptive sentencing guideline range was 151 to 188 months. D.I. 157 ¶ 110. At the government's request, I granted a four-level downward departure from the guidelines, resulting in a sentencing guideline range of 100 to 125 months. 2.21.24 Sent'g Tr. (docketed as D.I. 167) 9:25–10:2. The government asked for a sentence of 100 months. D.I. 155 at 1. Arroyo-Marrero asked for a downward variance to sixty months based on Arroyo-Marrero's desire to be able to care for his wife who was suffering from cancer and his father who had Alzheimer's. *See* D.I. 154 at 5; 2.21 Tr. 10:7–12:17. I granted a downward variance and sentenced Arroyo-Marrero to eighty-eight months of imprisonment, four years of supervised release, and a special assessment of $100 payable to the United States. D.I. 159.

At the sentencing hearing, I weighed the § 3553(a) factors. I stated in relevant part:

4

All right. So, Mr. Arroyo Marrero, the law requires me to give you a sentence that is sufficient -- that means enough -- but not more than enough, not greater than necessary to meet the purposes of sentencing.

The first purpose[] of sentencing is to make sure that the sentence reflects the seriousness of the offense. And your offense is very, very serious. You were a significant drug dealer. You had an assault rifle. You had weapons in your house.

You were preparing yourself, whether it be [for] a retaliatory shooting or whether it be [for] a defensive, or potentially a defensive situation, you were prepared to use weapons in Philadelphia. And those guns didn't have a serial number. And there's no good reason to have a gun without a serial number. The only people who carry guns without serial numbers are people who are going to use the guns for bad reasons because they don't want the gun traced. So your offense, it's very serious.

The second purpose of sentencing is deterrence. And by deterrence, that means to send a message to you personally and to the [public] at large that the type of crime you committed is to be avoided at all costs, because if you commit the type of crime you're facing, you will pay a significant penalty.

So the first two purposes of sentencing say to me that your sentence has to be substantial. And your guidelines reflect that. Your guidelines, when we start the guidelines, they are very, very high. Over 150 months.

The third purpose of sentencing is to make sure the sentence takes into consideration the person of the defendant, personal characteristics of the defendant. Like most people, you are a mixed bag. *You've done some*

5

> *good. You were caring for your father.* You've got a loving family, that's obvious.
>
> *You know, the downside is, you were subjecting your children to great risks by having guns in the house and dealing drugs. You put their lives in danger. You put your father's life in danger. You put your wife's life in danger.*
>
> The fourth purpose of sentencing is to avoid disparities. And what we mean by that is to treat people the same, to treat them fairly. That's where the guidelines come in.
>
> That's why I rarely, rarely depart from the guidelines, because it gives me the greatest confidence that I'm not doing anything unfair, I'm not doing anything unusual to a defendant, and I'm thinking about how other courts are treating defendants who are in the same situation with the same backgrounds.
>
> *I am going to factor into your sentence the personal situation of your wife and your family. And so I'm going to vary the sentence, and when I consider the totality of the factors I've discussed, I'm going to sentence you to 88 months.* And there's no precision in that, but that's what I'm going to do.

2.21 Tr. 17:23–20:3 (emphasis added).

I stated explicitly how I had considered Arroyo-Marrero's family circumstances in determining his sentence:

> THE COURT: The last thing I want to say is this. *I have already factored into this sentence what I believe is compassionate release.*
>
> I, as a general rule, do not factor into a sentence compassion for the family circumstances because I don't

6

>think it's fair. I think it can be manipulated. You have very, very unusual circumstances. So that has been factored into what I've done.
>
>*So what I'm telling you is, if you get some prison companion who says, "Oh, you should file a compassionate release motion," I've already factored that in.*
>
>All right. Do you understand?
>
>THE DEFENDANT: Yes.

2.21 Tr. 22:17–23:5 (emphasis added).

I also explained to Arroyo-Marrero and his counsel, Mr. Ortiz, how my sentencing decision would impact any future compassionate release motions:

>THE COURT: Yes, that makes sense to me, but I think we need to make sure --
>
>MR. ORTIZ: Yep. I agree.
>
>THE COURT: -- we go through the letters [sent to me by Arroyo-Marrero that had asked for a compassionate release]. And I also, the reason why I want to be upfront about the compassionate release is I'm sentencing him today.
>
>MR. ORTIZ: Right.
>
>THE COURT: *And I will factor into my sentence the circumstances of his family. And so I'm basically telling him, so if he gets sentenced and then he files a compassionate release request, based on anything we've talked about in sentencing, I'm denying it.* And I just want to make that clear, you know --
>
>MR. ORTIZ: Understood.

7

> THE COURT: -- I'm considering all those factors in setting a sentence.

2.21 Tr. 7:8–23 (emphasis added).

Arroyo-Marrero's expected release date is August 31, 2027. D.I. 169-2 at 2; Bureau of Prisons' Inmate Locator, https://www.bop.gov/inmateloc/?os=vb.&ref=app [https://perma.cc/2FD3-Q5KY].

On December 16, 2024—less than a year after his sentencing—Arroyo-Marrero filed the pending motion. D.I. 164.

## II.    ANALYSIS

In general, a district court cannot "modify a term of imprisonment once it has been imposed" unless a defendant is eligible for a sentence reduction pursuant to 18 U.S.C. § 3582(c). *Dillon v. United States*, 560 U.S. 817, 819 (2010) (quoting 18 U.S.C. § 3582(c)). Section 3582 was amended in 2018 as part of the First Step Act. First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (codified as amended at 18 U.S.C. § 3582).

Before the enactment of the First Step Act, only the Director of the Bureau of Prisons could file a motion seeking a sentence reduction, sometimes also called "compassionate release." Now a motion may be filed by either the Director of the Bureau of Prisons or the defendant. *See* 18 U.S.C. § 3582(c)(1)(A). But the defendant may not file a motion until "after [he] has fully exhausted all

8

administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ." § 3582(c)(1)(A). Here, Arroyo-Marrero has filed the motion on his own behalf. *See* D.I. 164. The government does not dispute that Arroyo-Marrero has exhausted all administrative remedies. *See* D.I. 169 at 8–9.

Although the First Step Act changed the process by which inmates can request a reduced sentence, it did not alter the statutory standards that must be met for that request to be granted. *United States v. Andrews*, 12 F.4th 255, 258 (3d Cir. 2021) ("The First Step Act added the procedure for prisoner-initiated motions while leaving the rest of the compassionate-release framework unchanged."). The Sentencing Reform Act of 1984 established the statutory standard for reducing a sentence. Sentencing Reform Act of 1984, Pub. L. No. 98-473, ch. 2, sec. 212, § 3582, 98 Stat. 1837, 1987, 1998–99. Under that statute, a court may reduce the term of imprisonment if it finds that "extraordinary and compelling reasons warrant such a reduction," and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A). The Sentencing Reform Act did not define what constitutes "extraordinary and compelling reasons," instead directing the Sentencing Commission to promulgate policy statements that do so. 28 U.S.C. §§ 994(a)(2)(C), 994(t).

9

Section 1B1.13 of the Sentencing Guidelines is the applicable policy statement for § 3582(c)(1)(A). *See* U.S. Sent'g Guidelines Manual § 1B1.13(a)(3) (U.S. Sent'g Comm'n 2024) (requiring that a reduction "pursuant to 18 U.S.C. § 3582(c)(1)(A)" be "consistent with this policy statement"). A defendant is eligible for a sentence reduction if, after considering the factors in 18 U.S.C. § 3553(a), a court determines that three criteria are satisfied: (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) "the reduction is consistent with this policy statement." U.S. Sent'g Guidelines Manual § 1B1.13(a) (U.S. Sent'g Comm'n 2024).

Arroyo-Marrero argues that I should reduce his sentence under § 3582(c)(1)(A) because Sentencing Guidelines Amendment 814 "provides relief to individuals who are facing extraordinary challenges in their daily lives of incarceration." D.I. 164 at 1. Amendment 814 expanded the descriptions of "extraordinary and compelling" circumstances that merit compassionate release under 18 U.S.C. § 3582(c)(1)(A). U.S. Sent'g Guidelines Manual § 1B1.13, amend. 814 (U.S. Sent'g Comm'n 2024), https://www.ussc.gov/guidelines/amendment/814 [https://perma.cc/U5AL-PYXU]. As amended, "extraordinary and compelling" circumstances now include the "incapacitation of the defendant's spouse . . . when the defendant would be the only available caregiver for the

spouse" and "incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent." U.S.S.G. §§ 1B1.13(b)(3)(B), (C). The amended version of § 1B1.13 took effect on November 1, 2023.

I will deny Arroyo-Marrero's motion for two reasons. First, Arroyo-Marrero has not shown that extraordinary and compelling reasons warrant a reduction of his sentence. A defendant moving for compassionate release bears the burden of demonstrating an extraordinary and compelling reason that justifies a sentence reduction. *See United States v. Kramer*, 2024 WL 313389, at *1–2 (3d Cir. Jan. 26, 2024). Here, Arroyo-Marrero has not provided sufficient evidence that his wife is incapacitated or that he is the "only available caregiver" for his wife and father.

Arroyo-Marrero has first failed to show that his wife is incapacitated for the purposes of U.S.S.G. § 1B1.13. To fulfill this burden, a defendant should provide "adequate information and documentation . . . including, but not limited to, a statement and verifiable medical documentation regarding the individual's incapacitation . . . ." *United States v. Walker*, 2024 WL 580152, at *3 n.2 (D.N.J. Feb. 13, 2024) (internal citation and alteration omitted). The Sentencing Guidelines do not define incapacitation, but other courts have looked for guidance to Bureau of Prisons Program Statement § 5050.50. *See, e.g., United States v. Doolittle*, 2020 WL 4188160, at *2 (D.N.J. July 21, 2020). Section 5050.50 of the

11

BOP Program Statement defines incapacitation as "a serious injury, or a debilitating physical illness [such that] the result of the injury or illness is that the spouse . . . is completely disabled, meaning that the spouse . . . cannot carry on any self-care and is totally confined to a bed or chair." Hugh J. Hurwitz, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), U.S. Dep't of Just. Fed. Bureau of Prisons 10 (2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf [https://perma.cc/453F-EKFX] (hereinafter BOP Program Statement). Alternatively, a spouse may be incapacitated if she has a "severe cognitive defect (e.g., Alzheimer's disease or traumatic brain injury that has severely affected the spouse's . . . mental capacity or function), but may not be confined to a bed or chair." BOP Program Statement § 5050.50 at 10. The government does not dispute that Arroyo-Marrero's father, who has Alzheimer's, is incapacitated. *See* D.I. 169 at 9–10; BOP Program Statement § 5050.50 at 10 (listing Alzheimer's as an example of a "severe cognitive defect" that constitutes incapacitation).

With respect to his wife, Arroyo-Marrero asserts that "[e]very time she take[s] the procedure of [chemotherapy] it disable[s] her complete[ly]." D.I. 164-4 at 1. But Arroyo-Marrero has provided only two documents in support of this assertion—a one-paragraph letter from his wife's oncology social worker, D.I. 164-2, and a document showing a list of his wife's medical visits and issues,

12

D.I. 164-3. Neither of these documents shows that Arroyo-Marrero's wife "cannot carry on any self-care and is totally confined to a bed or chair." BOP Program Statement § 5050.50 at 10. Instead, the documents show that Arroyo-Marrero's wife has been able to attend chemotherapy sessions and other medical appointments while Arroyo-Marrero has been incarcerated.

Arroyo-Marrero has also failed to establish that he is the "only available caregiver" for his wife and father. Like with incapacitation, courts often rely on BOP Program Statement § 5050.50 to determine whether a defendant is the "only available caregiver." *See, e.g., Doolittle*, 2020 WL 4188160, at *3. A defendant is the "only available caregiver" when there is "no other family member or adequate care option that is able to provide primary care for the spouse [or parent]." BOP Program Statement § 5050.50 at 10. To establish sole availability, a defendant must provide a "statement and letters of documentation that the [defendant] is the only family member capable of caring for the spouse [or parent]." *Doolittle*, 2020 WL 4188160, at *3.

Here, Arroyo-Marrero offers mere conclusory statements that he is the only available caregiver for his wife and father. In his motion, Arroyo-Marrero "affirms he is the only remaining caregiver for his physically disabled father and his wife who live together." D.I. 164 at 3; *see also* D.I. 164-4 at 2 (stating in a handwritten letter that he "is the only care giver of [his] family"). He also states that

13

"[a]lthough there are other family members that live in _____ none is available to serve in a caregiving capacity because of their work and familial obligations and their own health issues." D.I. 164 at 3 (blank in original). He points to "enclosed letters and doctors['] letters confirming the need for a caregiver." D.I. 164 at 3. The attached exhibits may show that his father requires a caregiver. *See* D.I. 164-3 at 2. But the exhibits do not show that there is "no other family member or adequate care option that is able to provide primary care" for Arroyo-Marrero's wife and father. BOP Program Statement § 5050.50 at 10. Arroyo-Marrero has therefore failed to establish that he is the only available caregiver for his wife and father. I thus need not consider the § 3553(a) factors.

Second, even if Arroyo-Marrero established an "extraordinary and compelling" reason for a sentence reduction, as evident from the excerpts of the sentencing hearing quoted above, I took into account Arroyo-Marrero's family circumstances when I granted him a variance and sentenced him to eighty-eight months. 2.21 Tr. 7:8–23, 19:23–20:2. I even told Arroyo-Marrero at the sentencing hearing that if he were to file a compassionate release motion based on the same family circumstances, I would deny it. 2.21 Tr. 7:15–23. Because the present motion relies on the same family circumstances without any new information, I do not believe a further departure or variance is warranted. *See, e.g.*, *United States v. Brown*, 2024 WL 1848011, at *3 (W.D. Mich. Apr. 29, 2024)

14

(finding that a defendant's request that the court "review arguments already considered by the sentencing judge [in granting a downward variance] and make a different call . . . [does not] rise[] to an extraordinary and compelling reason for compassionate release"); *United States v. Lum*, 2021 WL 358373, at *5 (D. Haw. Feb. 2, 2021) (denying defendant's compassionate release motion after the court had already granted a downward variance "for many of the same reasons repeated by the defense [in the present motion for compassionate release]").

## III.  CONCLUSION

For the reasons stated above, I will deny Arroyo-Marrero's Motion to Reduce Sentence Under 18 U.S.C. § 3582(c)(1)(A).

The Court will issue an Order consistent with this Memorandum.

June 6, 2025

                                                  *[signature]*
                                                    Chief Judge